John A. Miller's Sentencing Memorandum

John A. Miller respectfully submits this memorandum in advance of sentencing following his guilty plea to one count of wire fraud in violation of 18 U.S.C. § 1343 and one count in violation of 18 U.S.C. § 1957. Mr. Miller's Presentence Investigation Report assigns a total offense level of 23 and Criminal History Category of I, which yields an advisory Guidelines range of 46-57 months' imprisonment.

For the reasons set forth below, Mr. Miller respectfully requests that the Court impose a sentence below the advisory Guidelines range, with consideration given to his acceptance of responsibility, genuine remorse, lack of criminal history, advanced age, extensive medical needs, and rehabilitative prospects. Such a sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

John A. Miller

Mr. Miller was born on April 26, 1949, to Norman and Thelma Miller. Mr. Miller's father, a master cabinet maker, and his mother, a homemaker, hospital administrator, and devoted mother, raised Mr. Miller and his brother, Norman Jr., among family in Rancocas, New Jersey. The community around Mr. Miller during his childhood was tightknit, with relatives around every corner, including his paternal grandmother, who shared a building with the family, and several uncles who owned local farms. Mr. Miller's parents provided their children with a stable home life in which their physical and emotional needs were met. Although Mr. Miller's parents have since passed away, he looks back on his relationship with them, which lasted until their deaths, with the utmost fondness.

Faith has been an unshakeable pillar of Mr. Miller's life since his childhood. His family was very active in their local Methodist Church where Mr. Miller's "Aunt" Alice was an

organist. Alice taught Mr. Miller to play the organ, and by tenth grade he was playing during services. During this time, Mr. Miller was also occasionally entrusted with directing the church's volunteer choir. After completing high school, Mr. Miller left to attend Asbury College, a Christian university in Kentucky. Mr. Miller struggled to adjust as he found the college "excruciatingly" homophobic. Still conflicted about his sexuality in an era less accepting than today, Mr. Miller realized the environment was untenable for his academic pursuits and withdrew after a single semester.

Music was Mr. Miller's safety net after his semester at Asbury. While not a lifelong professional pursuit, music offered Mr. Miller opportunities to support himself and further develop his faith. Immediately after returning from Kentucky, Mr. Miller registered as an available substitute organist with the American Guild of Organists. During this time, Mr. Miller was asked to substitute for an Episcopalian church in New Jersey, and despite some early reservations, agreed to play. Accepting the position changed Mr. Miller's life. Not only was he offered a permanent position which began his lifelong journey in the Episcopalian faith, Mr. Miller also found a partner in life. Through his connection with the church, Mr. Miller was introduced to Stuart Yost (Stuart) and the two began a dedicated 40-year relationship.

Mr. Miller cherishes his decades with Stuart. The two worked diligently to build a life together in hopes of retiring abroad. Stuart served as the head of the Arts and Humanities Department of Plymouth-Whitemarsh High School. After meeting Stuart, Mr. Miller shifted his professional pursuits from music and, in 1973, found a position with the Corporate Trust Department of Philadelphia National Bank. In 1984, after more than a decade of diligent service, Mr. Miller chose to leave the bank and shift to entrepreneurial endeavors. Beginning with a

personal administrative services business, Mr. Miller created a diverse portfolio of businesses, including an art gallery, cleaning service, and a hospitality reservation service.

As the years passed, however, Stuart's health declined, and Mr. Miller also assumed the ever-expanding role of caretaker. When Stuart retired in 1993, Mr. Miller began winding down his business operations and sold the couple's home in preparation for their move abroad. This process was arduous and time consuming, and to support themselves in the interim before their move, Mr. Miller began working as administrator for Saint Mark's Church until 1998, when the couple finally moved to Mexico.

While their time in Mexico was filled with joy, Stuart's health forced the couple to move back to Philadelphia in 2001. Mr. Miller immediately rejoined Saint Mark's Church and began volunteering as the parish's Master of Ceremonies. Through this work, Mr. Miller was recommended for a position with the Clergy Assurance Fund of Pennsylvania (CAF) that same year and served as Executive Director and Treasurer for more than 20 years. Mr. Miller worked closely with former CAF Treasurer Reverend Rudolph Moore to modernize, streamline, and expand the fund. Mr. Miller's work as Executive Director was exemplary such that when Reverend Moore died in 2014, Mr. Miller was elected to succeed him as treasurer.

During his time with the CAF, Mr. Miller continued to provide essential care for Stuart as his condition declined. Unfortunately, Stuart died suddenly in 2008, and Mr. Miller faced the prospect of life alone for the first time since the early 1970s. To cope with his grief, Mr. Miller devoted his time outside of CAF to volunteering with various church and music-based organizations. Most notably, Mr. Miller volunteered administrative services to the Choral Arts Philadelphia, the Bach Festival of Philadelphia, and the Women's Sacred Music Project. Mr. Miller also offered part-time professional support to clergy members adjusting to new positions.

Only after assuming the role of CAF Treasurer after Reverend Moore's death in 2014 did Mr. Miller step back from his volunteer and part-time work to dedicate all his time to the needs of families covered by the CAF.

Mr. Miller's time with the CAF, particularly while working side-by-side with Reverend Moore, was the most professionally rewarding of his life. By 2014, the duo managed to: organize a celebratory event at the historic Christ Church where the first organizational meeting was held in 1769; develop a new "Doing Business As" name to better define the parameters of the mission and ministry; write and produce a short film describing the expansion CAF's work; and secure, redesign, and furnish a new suite of offices and a virtual meeting facility in response to the COVID pandemic.

Despite the circumstances Mr. Miller is currently facing, including an inability to be hired professionally because of this matter and his advanced age, he continued to volunteer his time to the church in administrative roles. However, this has become more difficult with time because he has been forced to move several times and has experienced a decline in his health. These circumstances have made caring for his overall health nearly impossible, and Mr. Miller can no longer easily travel to the church. Currently, Mr. Millers' diagnoses include frailty, anxiety, episodes of recurrent major depressive disorder, chronic left knee pain, balance problem, prostate cancer, anemia, hypertension, and mixed hyperlipidemia. Mr. Miller's prostate cancer is of utmost concern because despite successful treatments when originally diagnosed, his cancer markers have recently risen. To address these health concerns Mr. Miller is prescribed: alprazolam for anxiety; amlodipine, nadolol, and Olmesartan for high blood pressure; omeprazole for heartburn; sertraline for depression; and simvastatin for high cholesterol. In addition, Mr. Miller needs iron infusions for anemia and will likely need a knee replacement. Mr.

Miller has also noticed potential early symptoms of Lewy Body Dementia. Currently, Mr. Miller relies completely on government benefits to provide for both his extensive medical care and general welfare. Further, after depleting his personal funds, Mr. Miller was evicted from the home he was renting. Fortunately, Mr. Miller's relationship with his fellow parishioners was so strong that one friend allowed him to occupy a vacant apartment they own free of charge.

While facing these challenges, Mr. Miller continues to strive to better understand and remedy his personal failures that led to this matter. Despite never feeling that therapy was necessary before this matter began, Mr. Miller has regularly met with therapists consistently since 2022. Currently, Mr. Miller receives bi-weekly therapy at Penn Geriatric Medicine Ralston. It is Mr. Miller's sincerest hope that through therapy he can better understand why, after decades of exemplary service, both professionally and altruistically, he lost sight of his personal morality. Mr. Miller believes that with continued professional support he can find the path back to righteousness.

<u>Statutory Considerations</u>

The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing as reflected in 18 U.S.C. § 3553(a). When imposing a particular sentence, the court shall consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a) (1). It is essential that the sentence reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most

effective manner. 18 U.S.C. § 3553(a)(2). The Court may impose a sentence that deviates from the Guidelines range when it is reasonable considering all the factors of 18 U.S.C. § 3553(a). Here, Mr. Miller's personal characteristics and history weigh in favor of sentence below the Guidelines range.

Application of the Statutory Factors and Sentencing Considerations to the Present Case

The above-mentioned sentencing objectives as they apply to Mr. Miller can be met with a sentence of home incarceration or supervised release, especially considering Mr. Miller's personal circumstances, characteristics, and history. As the Third Circuited emphasized, "[a]ppropriate sentences can only be imposed when sentencing courts 'consider the widest possible breadth of information about a defendant.'" United States v. Salinas-Cortez, 660 F.3d 695, 699 (3d Cir. 2011) (quoting Pepper v. United States, 562 U.S. 476, 488 (2011)).

Recidivism

When sentencing Mr. Miller, the Court will consider the need to protect the public from the possibility that he will commit future crimes. However, the likelihood that Mr. Miller will commit any further crimes is virtually non-existent. Mr. Miller is 77 years old and has no prior criminal history, which alone place him in the category of least likely to recidivate. Further, he is in continuingly declining poor health and the subject of extensive public scrutiny, both of which make it unlikely that Mr. Miller would ever be in a position to reoffend, a circumstance which courts have found can justify a variance. See United States v. Pauley, 511 F.3d 468 (4th Cir. 2007) (affirming District Court downward variance, in part, because of professional reputational loss).

Research also indicates that Mr. Miller is unlikely to recidivate. According to the United States Sentencing Commission (USSC), age is closely associated with recidivism, and the likelihood of re-offense steadily declines as offenders age. In its 2022 report, the USSC found that the recidivism rate among "older offenders," those over 50, was less than half their younger counterparts. Given the correlation between age and declining recidivism, along with the fact that Mr. Miller is 27 years beyond the lower end of the "older offender" threshold and in deteriorating health, his likelihood of appearing before the Court in the future is miniscule. See https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf.

Mr. Miller's Criminal History Category of I with zero criminal-history points further evidences a low risk of recidivism. The USSC has found that recidivism rates increase substantially with criminal history score. According to a 2017 USSC report, only 30.2% of Criminal History Category I offenders with zero criminal history points were rearrested, compared with 46.9% of Criminal History Category I offenders with one criminal history point. The Commission further found that zero-point offenders with no prior contact with the criminal justice system had a rearrest rate of only 25.7%. See https://www.ussc.gov/research/research-reports/criminal-history-and-recidivism-federal-offenders?utm. As noted in this study, advanced age strongly correlates with reduced recidivism, and when combined with Mr. Miller's criminal history, both indicate a very low risk of re-offense.

When considering the need to protect the public from potential further crimes, the research reflects that offenders of advanced age with no criminal history recidivate the least. Mr. Miller is of that category and in no condition physically to commit future crimes. Therefore, the

goal of protecting the public would be achieved by a sentence of probation, or alternatively, home confinement.

Deterrence

Another factor the Court will consider is the need to ensure adequate deterrence from criminal conduct. A key concern in that regard is whether and to what extent the threat of punishment is an effective deterrent. A recent Department of Justice (DOJ) publication found that severe sentences did not serve as the most effective deterrence from future crimes. According to the report, "[p]risons are good for punishing criminals and keeping them off the street … prison sentences (particularly long ones) are unlikely to deter future crime." Rather, the DOJ believes that the certainty of getting caught and punished has a much stronger deterrent effect than increasing the severity of the punishment itself. https://ncjrs.gov/pdffiles1/nij/247350.pdf. This conclusion is supported by research from the National Research Council committee, which concluded that,

> "[t]he incremental deterrent effect of increases in lengthy prison sentences is modest at best. Because recidivism rates decline markedly with age, lengthy prison sentences, unless they specifically target very high-rate or extremely dangerous offenders, are an inefficient approach to preventing crime by incapacitation." https://www.nationalacademies.org/read/18613/chapter/15

Mr. Miller has pled guilty in this matter, and it is a certainty that he will be punished. However, there is no basis to believe that imposing a severe sentence of imprisonment will somehow bolster the general or specific deterrent effect of such a sentence. Given Mr. Miller's age, declining health, acceptance of responsibility, and low chance of recidivism, a sentence below the Guidelines range will provide sufficient, but not greater than necessary,

deterrence against future crimes.

Incarceration

When considering a sentence with a PSR recommendation of incarceration, the Court should only sentence a defendant to prison when such a sentence is just considering the totality of the defendant's circumstances. United States v. Tomko, 562 F.3d 558, 571 (3d Cir. 2009) (imposing sentence of home confinement, rather than imprisonment, and ordering restitution based on defendant's personal characteristics and lack of criminal history). Like in Tomko, a sentence that avoids prison time will still promote the goals of sentencing. Mr. Miller dedicated his life to his community, had a decades-long unblemished professional career, and is in failing health. These factors suggest that imprisonment is not just. If incarcerated, Mr. Miller, who is unfit for manual labor, will likely have no chance to use his professional skills to pay the financial debt he owes the victims of this crime nor to provide the volunteer services about which he is so passionate. Further, his extensive medical needs and the treatment challenges inherent in a prison setting make an alternative sentence more appropriate.

The Life and Character of Mr. Miller

Mr. Miller hopes that, after a close examination of his entire life and character, the Court will find this factor weighs in favor of a sentence below the guideline recommendation. As also recognized in the PSR, Several of Mr. Miller's personal characteristics could justify a variance. To aid the Court in their analysis of his personal life and character, Mr. Miller presents the following for consideration of the Court:

Remorse, Guilt, and Acceptance of Responsibility

Mr. Miller is deeply regretful over his actions, and in no way seeks to downplay the seriousness of his crimes. However, this shame is now Mr. Miller's motivation though. Since the offense was uncovered in 2022, Mr. Miller has regularly seen at least one therapist, only cutting back on visits out of financial necessity. Currently, Mr. Miller sees a therapist. bi-weekly. Professional support has been invaluable to Mr. Miller as he strives every day to better understand how, after nearly a lifetime, he lost sight of his personal faith and morals. To best atone for his errors, Mr. Miller continues to volunteer nearly all of his time to his church despite his physical restrictions and the stresses related to this matter. Mr. Miller believes that if he receives a sentence that is an alternative to incarceration, he can continue to seek help and work to atone for his crimes and repay his debt to society and the victims of his offense.

Mr. Miller's cooperation in this matter reflects his acceptance of responsibility for the offense. As supported by the Government's Change of Plea Memorandum, Mr. Miller cooperated and timely agreed to a guilty plea which allowed the government to avoid costly trial preparation. Mr. Miller hopes that, by cooperating and accepting responsibility, he showed the Court his sincere wish to begin correcting his mistakes as soon as possible.

## Health Concerns

The Court should also consider Mr. Miller's declining physical health and his extensive current and likely future treatment needs. Currently, Mr. Miller is diagnosed with frailty, anxiety, episodes of recurrent major depressive disorder, chronic pain of left knee, balance problem, prostate cancer, anemia, and mixed hyperlipidemia. At age 77 and still a free man, these issues are debilitating and require extensive treatment. A period of incarceration could interrupt his treatment regimen and create new barriers to maintaining continuity of care. See

https://pmc.ncbi.nlm.nih.gov/articles/PMC8279398. At his advanced age and worsening condition, barriers to life maintaining treatment could have devastating consequences.

Mr. Miller is particularly concerned over potential treatment needs for his prostate. A cancer survivor, Mr. Miller's cancer markers have risen, and treatment may be a lifesaving necessity. However, according to a study published in the science journal PLOS One, outcomes for incarcerated people diagnosed with prostate cancer were worse, including after release, than for individuals who were never incarcerated.
https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0274703

Mr. Miller also suffers from mental health conditions that will require treatment and may be worsened by incarceration. Research has shown that entry into prison is associated with higher levels of psychiatric symptoms and deterioration in mental state.https://pubmed.ncbi.nlm.nih.gov/24237622/. This is especially concerning to Mr. Miller because he only recently began suffering from mental health disorders and is not experienced in handling the sudden deterioration of his mental state. Further, research has shown that prisons suffer from inadequate staffing and cumbersome procedures for accessing care, as well as concerns about the quality and accessibility of mental-health, and medical treatment, provided in prison. https://pubmed.ncbi.nlm.nih.gov/35722588/. Mr. Miller has only begun the journey of understanding his mental health struggles, and he hopes that the Court will offer a productive treatment plan which avoids the grave stresses of incarceration.

History of Philanthropy and Volunteering

Despite the offenses Mr. Miller pled guilty to here, most of his life was spent in service to his faith and community. Beginning in his teenage years with his church and their organ, and

continuing through decades, before 2015. with the CAF, Mr. Miller dedicated his personal and professional life to working for others. While acknowledging he lost his way at the end of his career, Mr. Miller is proud of and feels defined by his years of service for others. Working for his faith and his community filled Mr. Miller with purpose and joy, such that his continuing volunteer work with his Church is what motivates him despite this matter.

Along with the CAF, Mr. Miller has dedicated his time to various organizations and individuals. Mr. Miller cherishes the work he did with the Choral Arts Philadelphia, the Bach Festival of Philadelphia, and the Women's Sacred Music Project. Also, Mr. Miller was an essential aid to newly arrived clergy from various Episcopalian churches still settling into their roles, all in the hopes of allowing them to better serve their parishioners. Mr. Miller believes there is more that he can and, should the Court grant him an alternative sentence, is duty bound to do to atone for his failures.

## Conclusion

Mr. Miller has accepted full responsibility for his criminal conduct. He has cooperated with the government, pleaded guilty, and expressed genuine remorse. His Criminal History Category of I, personal circumstances, rehabilitative efforts, and low risk of recidivism all support a sentence below the advisory guidelines range. Such a sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, address Mr. Miller's rehabilitative needs, and allow him to provide full restitution for his victims.

Respectfully submitted,

Dated: August 31, 2026

TIMOTHY TARPEY, ESQ.
BAR NUMBER 88162
PT&L FIRM, LLC
1315 WALNUT ST., STE. 1605
PHILADELPHIA, PA 19107
215-851-8800
TARPEY@PTLFIRM.COM
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2026, I served a true and correct copy of the foregoing Defendant's Sentencing Memorandum upon counsel of record by [electronic filing through the CM/ECF system/email/other method consistent with local rules]:

Alisa Shver
USAO - EDPA
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

Timothy Tarpey, Esquire